# In the United States Court of Federal Claims

No. 13-581C
(Filed: October 26, 2015)

---

|  |  |
|---|---|
| OSVALDO AGUILAR, | ) Keywords: Immigration Bond; |
|  | ) Contract Interpretation; |
| Plaintiff, | ) Substantial Violation; 8 C.F.R. |
|  | ) § 103.6. |
| v. | ) |
|  | ) |
| THE UNITED STATES, | ) |
|  | ) |
| Defendant. | ) |
|  | ) |

---

*Matthew Scott Kriezelman*, Kriezelman, Burton & Associates, LLC, Chicago, IL, for Plaintiff.

*Benjamin Mark Moss*, Trial Attorney, with whom were *Benjamin C. Mizer*, Principal Deputy Assistant Attorney General, *Robert E. Kirschman*, Director, and *Steven J. Gillingham*, Assistant Director, Civil Division, U.S. Department of Justice, Washington, DC, and *Jody M. Prescott*, Associate Legal Advisor, U.S. Department of Homeland Security, Williston, VT, for Defendant.

## OPINION AND ORDER

**KAPLAN, Judge.**

In this case, the plaintiff, Osvaldo Aguilar, challenges a determination by U.S. Customs and Immigration Enforcement (ICE) that he substantially violated the terms of an immigration bond when he failed to deliver a bonded alien to ICE as directed. Currently before the Court are the parties' cross motions for judgment on the administrative record. Oral argument was held on the cross motions on October 21, 2015.

As explained below, the Court holds that ICE's decision was not arbitrary, capricious, or contrary to law. Accordingly, the government's motion for judgment on the administrative record is **GRANTED**, and Mr. Aguilar's motion is **DENIED**.

## BACKGROUND

### I. Regulatory Scheme

Like a bail bond, an immigration bond is a surety arrangement designed to ensure compliance with a government mandate to appear. <u>See</u> <u>United States v. Gonzales &</u>

Gonzales Bonds & Ins. Agency, Inc. (Gonzales II), No. 3:09-09-cv-04029, 2015 WL 2090395, at \*5 (N.D. Cal. May 5, 2015) (citing Decision, United States v. Gonzales & Gonzales Bonds & Ins. Agency, Inc., at 1–2 (U.S. Immigrations and Customs Enforcement: Jan. 2, 2014), ECF No. 156-1); 8 C.F.R. § 103.6. This case involves a type of immigration bond known as a delivery bond, under which the surety (or "obligor") promises to cause the alien to appear upon the government's demand. See Gonzales II, 2015 WL 2090395, at \*5; DHS Form I-352, http://www.ice.gov/forms (standard form used to execute delivery bonds).

ICE, the agency that executes these bonds, is part of the Department of Homeland Security (DHS). See 8 U.S.C. § 1103(a); 8 C.F.R. § 236.1.[1] Within DHS, ICE manages (among other things) the apprehension, detention, and removal of aliens who are not lawfully present in the United States. See 8 U.S.C. § 1103(a); 8 C.F.R. § 236.1; Enforcement and Removal Operations, U.S. Immigrations and Customs Enforcement, http://www.ice.gov/ero (last visited Oct. 23, 2015). To that end, ICE is empowered to file charging documents and initiate removal proceedings—that is, proceedings to determine whether an alien who has been detained is removable. See 8 U.S.C. §§ 1225–31; 8 C.F.R. §§ 235.6, 236.1, 239.1–.3.

While ICE may initiate the proceedings that determine whether an alien will be deported or instead permitted to remain in the United States, the proceedings themselves are conducted by the Department of Justice (DOJ) through the Executive Office for Immigration Review (EOIR). See Homeland Security Act §§ 1101–03; 8 U.S.C. §§ 1103(g), 1229a; 8 C.F.R. §§ 1003.0, 1240.1–.16.  ICE initiates the proceedings by serving the alien with a Notice to Appear (DHS Form I-862) and filing the notice with the immigration court. See 8 C.F.R. §§ 1003.13–.14. Because of the backlog of cases, removal proceedings may remain pending for several years. See The 2014 Humanitarian Crisis at Our Border: A Review of the Government's Response to Unaccompanied Minors One Year Later: Hearing Before the S. Comm. on Homeland Security and Governmental Affairs, 114th Cong. 1–2 (2015) (statement of Juan P. Osuna, Director, EOIR) (stating that EOIR had 449,569 cases pending as of May 26, 2015, and that certain non-priority hearings will not be held until November 2019).

---

[1] For most of the twentieth century, the primary agency tasked with immigration policy and enforcement was not DHS, but the Immigration and Naturalization Service (INS), which was part of the Department of Justice. See Exec. Order No. 6,166 § 14 (June 10, 1933), http://www.archives.gov/federal-register/codification/executive-order/06166.html (creating INS) (last accessed Oct. 23, 2015); Maria Baldini-Potermin, Immigration Detention and Custody Redeterminations: The Evolution From the 1996 IIRIRA to Current Procedures and Strategies, 15-05 Immigr. Briefings 1, 1–2 (May 2015). After the attacks of September 11, 2001, however, Congress dissolved INS and divided its responsibilities among several different agencies, including the newly created DHS. See Homeland Security Act of 2002, Pub. L. No. 107-296, §§ 103, 471, 478, 116. Stat. 2135 (Nov. 25, 2002); 8 U.S.C. § 1103. DHS then assumed primary responsibility for administering and enforcing the immigration laws. 8 U.S.C. § 1103.

The upshot of the division of responsibilities between ICE and EOIR is that aliens may have contact with two separate agencies while removal proceedings are pending.  On the one hand, they may interact with ICE in connection with the bond and release process. On the other, they are subject to the jurisdiction of DOJ (through EOIR) for purposes of the administrative proceedings that determine whether they will be removed or allowed to stay in the United States.

## II.  Factual and Procedural Background

In October 2007, ICE detained an alien named Rene Gomez-Cazares and charged him with being removable from the United States under 8 U.S.C. § 1182(a)(5)(A)(i) for being present in the United States without permission. Decision, Aguilar v. United States, at 3 (U.S. Immigrations and Customs Enforcement Feb. 24, 2015) [hereinafter "ICE Decision"], ECF No. 33-1; Supplemental Administrative Record (SAR)[2] at 28, ECF Nos. 33-3 to 33-8. A few weeks later, on November 7, Mr. Aguilar went to ICE's offices in Chicago to secure Mr. Gomez-Cazares's release from detention, pending immigration proceedings. ICE Decision at 3; SAR at 31. Mr. Aguilar executed a $15,000 cash bond, becoming the bond's obligor. ICE Decision at 3, 5; SAR at 31–37; see also SAR at 80 (declaration of ICE Assistant Field Office Director Sylvia Bonaccorsi-Manno describing ICE's process for executing cash bonds). ICE's Chicago offices are located on the fourth floor of the federal building at 101 West Congress Parkway. ICE Decision at 3, 5. Several other agencies also use the building, including EOIR, which holds hearings for detained aliens in the building's basement. See SAR at 77–78.

Under paragraph C of the bond Mr. Aguilar executed, the full sum of $15,000 was "to be paid to the United States immediately upon the failure to comply with the terms set forth" in paragraph G(1) of the bond. SAR at 34 ¶ C. In turn, paragraph G(1) specified that "the full amount of the bond . . . becomes due and payable" if the obligor "fails to surrender the alien in response to a timely demand while the bond remains in effect." SAR at 35 ¶ G(1). Conversely, the bond would "terminate" if the obligor

> cause[d] the alien to be produced or to produce himself/herself to an immigration officer or an immigration judge . . . as specified in the appearance notice, upon each and every written request until

---

[2] The supplemental administrative record includes all the documents contained in the original administrative record that ICE compiled in this matter. As is described below, after ICE submitted the original administrative record, the Court remanded the case back to ICE, which then supplemented the record. Because the supplemental record also includes the entire original administrative record, the Court will cite only the supplemental administrative record. In addition, for convenience, the Court will cite to the Bates-stamped page numbers of the supplemental administrative record, rather than the ECF page numbers.

exclusion/deportation/removal proceedings in his/her case are finally terminated.

Id.[3]

According to Mr. Aguilar, he believed that after executing the bond, the next communication he would receive from ICE would require him to produce Mr. Gomez-Cazares for a hearing in front of an immigration judge. SAR at 73; Pl.'s Mot. for J. on the Admin. R. ("Pl.'s Mot.") at 10. This belief was mistaken; for, as described above, removal proceedings are managed and conducted by EOIR. Thus, any notice of Mr. Gomez-Cazares's hearing would come from EOIR, not ICE.[4] But when EOIR attempted to notify Mr. Gomez-Cazares about his upcoming hearing in November 2007, it unfortunately mailed the notice to the wrong address. ICE Decision at 3–4; SAR at 28. Mr. Gomez-Cazares thus failed to appear, and, in a decision issued on December 21, 2007, the immigration judge found him removable in absentia. ICE Decision at 4; SAR at 38.

As a result of this ruling, on January 24, 2008, ICE issued a delivery demand to Mr. Aguilar. ICE Decision at 4; SAR at 39. The demand, which was printed on ICE letterhead, stated: "[u]nder the terms of the Delivery Bond you posted for the above alien(s), Immigration and Customs Enforcement (ICE) is making demand upon you to deliver or cause to appear the above alien[]." SAR at 39. The notice instructed Mr. Aguilar to deliver Mr. Gomez-Cazares to "101 W. Congress Pkwy, Chicago, Illinois 60605" at 9 A.M. on February 28, 2008. Id. It did not specify an office number or floor to which he should be delivered. Id. Nor did it indicate explicitly whether he should be delivered to an immigration official or an immigration judge. See id.

According to Mr. Aguilar, he and Mr. Gomez-Cazares travelled to the federal building at 101 West Congress Parkway on February 28. Am. Compl. ¶¶ 25–26; SAR at 73. All visitors to the building must pass through a security screening at the entrance. SAR at 73. Notably, because EOIR uses the building only for hearings involving detained aliens, building visitors do not have free access to the EOIR courtrooms on the basement level. Id. Instead, they must be escorted to the basement by a security guard. Id. at 78. By contrast, ICE's offices on the fourth floor are open to the public. Id. at 77–78. A sign in the first-floor lobby directs visitors looking for ICE to an elevator, which they can take to the fourth floor. Id. The elevator does not go to the basement. Id.

Upon their arrival, Mr. Aguilar showed the delivery demand to a security guard, who then escorted Mr. Aguilar and Mr. Gomez-Cazares to the EOIR courtrooms in the

---

[3] In addition, the bond would terminate if "the said alien is accepted by [ICE] for detention or deportation/removal" or if "the bond is otherwise cancelled." SAR at 35 ¶ G(1).

[4] ICE may set the date and time for the hearing in the initial Notice to Appear; but if it does not, or if the hearing date and time are changed, EOIR is responsible for notifying the alien of the hearing's date and time. 8 C.F.R. § 1003.18.

basement. Am. Compl. ¶ 26; SAR at 73. In his statement to ICE, Mr. Aguilar claimed that the two waited in the basement for some time before flagging an immigration court employee, who examined the delivery demand and advised them that it was in their best interests to leave immediately, as Mr. Gomez-Cazares was set to be detained and possibly deported. ICE Decision at 9–10; SAR at 73.[5] Unsettled by this news, Mr. Aguilar and Mr. Gomez-Cazares left and sought legal advice soon thereafter. Am. Compl. ¶ 27; SAR at 73.  Mr. Gomez-Cazares then retained an attorney to represent him.  SAR at 73.[6]

With the assistance of counsel, Mr. Gomez-Cazares learned that he had inadvertently missed his December 2007 EOIR hearing. Am. Compl. ¶ 13. Therefore, on March 28, 2008, Mr. Gomez-Cazares petitioned the immigration judge to re-open the removal proceedings. Id. In the meantime, however, ICE declared Mr. Aguilar's bond breached.[7] Mr. Aguilar received notice of the breach on March 18, 2008. ICE Decision at 4; SAR at 42, 44.

On April 4, the immigration judge granted Mr. Gomez-Cazares's motion to re-open the removal proceedings. SAR at 46. At this point, Mr. Aguilar apparently believed that any issues related to the immigration bond had been cured, as the removal order that served as the basis for ICE's demand had been rescinded. See Pl.'s Mot. at 8 ¶ 30 (arguing that the breach was "accidental . . . and was quickly remedied"). In ICE's view, though, the bond remained breached because Mr. Aguilar still had not delivered Mr. Gomez-Cazares to an ICE officer, or even contacted the agency regarding the breach notice. See ICE Decision at 7; Def.'s Cross-Mot. for J. on the Admin. R. ("Def.'s Mot.") at 13 ("The record establishes . . . that Mr. Aguilar failed to deliver [Mr. Gomez-Cazares] to an ICE officer on [the delivery] date, or ever.").

Mr. Aguilar did not submit an administrative appeal and the breach became administratively final. See 8 C.F.R. §§ 103.3, 103.5. Accordingly, on June 2, 2008, ICE

---

[5] The Court notes that in his complaint, Mr. Aguilar did not allege that an employee advised the pair to leave the building; rather, he alleged that he and Mr. Gomez-Cazares waited in the basement for an hour and left when they received no assistance. See Am. Compl. ¶ 26. Similarly, Mr. Aguilar does not allege that he received such advice in his motion for judgment on the administrative record (although at the oral argument on the motion, his counsel revived the assertion). As will be shown below, however, the distinctions between these versions of his story are immaterial to the Court's decision.

[6] As noted in the text below, Mr. Aguilar apparently did not retain an attorney to represent his interests in connection with the bond until sometime in 2011 after Mr. Gomez-Cazares secured lawful permanent residence. See SAR at 47.

[7] The breach notice states the bond was breached on March 5, 2008. SAR at 42. ICE represents that the stated date is erroneous, and the actual date of the breach was February 28, when Mr. Gomez-Cazares failed to appear. See ICE Decision at 4 n.7.

paid Mr. Aguilar the $145.47 in interest that had accrued over the life of the bond, but retained the principal. Def.'s Mot. at 5; see SAR at 50.

Three years later, in April 2011, Mr. Gomez-Cazares was granted lawful permanent residence status. SAR at 49. Shortly thereafter, Mr. Aguilar attempted (through counsel) to recover the $15,000 he had given for the bond. SAR at 47 (letter to ICE from Larry Adkison, Esq.). When this failed, Mr. Aguilar filed suit in the United States District Court for the District of Illinois. See Docket, Aguilar v. Napolitano, No. 1:12-cv-10354 (N.D. Ill.). Because Mr. Aguilar's claim exceeded the $10,000 threshold set by 28 U.S.C. § 1346(a)(2), the district court transferred the case to this Court. See Order on Mot. to Dismiss, Aguilar, No. 1:12-cv-10354, ECF No. 21.

After the transfer, the United States filed a skeletal administrative record and the parties filed cross motions for judgment on that record. ECF Nos. 23, 24. The Court concluded that the record was inadequate to permit it to review ICE's determination that Mr. Aguilar had substantially violated the terms of the bond. Therefore, on September 12, 2014, the Court denied the cross motions for judgment on the administrative record and remanded the case to ICE. The Court directed the agency to further develop the administrative record and render a decision setting forth its factual findings and explaining its determination. ECF No. 29.

**III. ICE's Decision on Remand**

On remand, ICE compiled additional evidence as the Court had directed. Mr. Aguilar submitted an unsworn statement describing the steps he took to attempt to comply with the delivery demand. SAR at 72–74. ICE also considered declarations from two federal employees familiar with operations at the 101 West Congress Parkway building: Sylvia Bonaccorsi-Manno, ICE's Assistant Field Office Director for Enforcement and Removal Operations, SAR at 76–96; and Christine Epstein, EOIR's immigration court administrator for the Chicago area, SAR at 97–98. Ms. Bonaccorsi-Manno's declaration included photographs of the signs in the 101 West Congress Parkway building that direct visitors to ICE's fourth-floor offices. SAR at 83–96.

In its decision on remand, ICE summarized the relevant regulatory background and the facts of the case, including the new facts presented by Mr. Aguilar. ICE Decision at 2–6. Noting that "[d]elivery bonds are violated if the obligor fails to cause the alien to be produced to the immigration office upon each and every request," ICE concluded that Mr. Aguilar had substantially violated the bond's conditions. Id. at 7–8 (internal quotations omitted). Citing Ruiz-Rivera v. Moyer, 70 F.3d 498 (7th Cir. 1996), ICE explained that "the breach was substantial and the alien never took steps to remedy the breach" because "Mr. Aguilar never delivered Mr. Gomez-Cazares to ICE, and Mr. Gomez-Cazares never reported to ICE at Mr. Aguilar's request." Id. at 8. Further, ICE reasoned that the breach was "intentional and not in good faith because Mr. Aguilar and Mr. Gomez-Cazares chose to leave 101 W. Congress Parkway without ever making contact with ICE officials, as they knew they were required to do after having received the demand notice." Id.

ICE rejected Mr. Aguilar's contention that his failure to comply with the demand notice was based on a reasonable belief that he was to deliver Mr. Gomez-Cazares to an immigration hearing, rather than to ICE. Id. at 9. First, ICE reasoned, Mr. Aguilar "should have read the demand notice more carefully;" had he done so, he would have known that he was to deliver Mr. Gomez-Cazares to ICE and not to an EOIR hearing. Id. at 10. Further, were he unsure of what the demand notice required, he could have contacted the ICE office to "resolve[] any doubt" about what to do. Id.

ICE's decision also pointed out that the demand notice was printed on ICE letterhead and that "[t]he signage in the building is sufficient to direct someone with a notice from ICE to the ICE offices on the fourth floor of the building." Id. at 11. Moreover, ICE stated that it "reasonably would expect an obligor who had completed bond paperwork less than four months prior to remember the general location of the ICE Offices and to be able to follow the signage to return there." Id. at 11.

In any event, ICE found, any lingering confusion about the identity of the agency to which Mr. Aguilar was to have delivered Mr. Gomez-Cazares should have been cleared up when he received the breach notice on March 18, 2008, which made no reference to an immigration court proceeding. Id. at 10–11. At that point, ICE observed, "if [Mr. Aguilar] were confused about his obligations under the bond, a reasonable person in Mr. Aguilar's position would have immediately contacted ICE officials to ask about the breach." Id. "Mr. Aguilar's attorney," however, "did not ask about the breach until over three years had passed." Id. at 11.

Finally, ICE noted that the mis-sent EOIR notice regarding Mr. Gomez-Cazares's removal hearing had "no bearing" on the demand notice ICE sent to Mr. Aguilar. Id. at 12. For all these reasons, ICE ultimately decided that Mr. Aguilar substantially violated the immigration bond, and that he therefore was not entitled to a return of his $15,000 bond deposit. Id.

## DISCUSSION

## I. Jurisdiction

Pursuant to the Tucker Act, the United States Court of Federal Claims has jurisdiction to "render judgment upon any claim against the United States founded . . . upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." 28 U.S.C. § 1491(a)(1). An immigration bond is a contract with the United States. E.g., United States v. Davis, 202 F.2d 621, 625 (7th Cir. 1953) ("The bond is a contract between the surety and the government that if the latter will release the principal from custody the surety will undertake that the principal will appear personally at any specified time and place to answer."); Gonzales II, 2015 WL 2090395, at *2. And because Mr. Aguilar is seeking monetary relief for the alleged breach of the immigration bond, as opposed to declaratory or injunctive relief, this Court's jurisdiction under the Tucker Act to hear his claim is clear. See Gonzales & Gonzales Bonds & Ins. Agency, Inc. v. Dep't of Homeland Sec. (Gonzales I), 490 F.3d 940, 945 (Fed. Cir. 2007) (holding that the Court of Federal

Claims lacked jurisdiction over immigration bond claims seeking specific performance and declaratory or injunctive relief, and noting that "there is a substantive difference between a plaintiff seeking the return of money it already paid the government and a plaintiff never having to pay the government in the first place").

## II.  ICE's Bond Breach Determination

### A. Applicable Standards

DHS regulations govern the issuance, cancellation, and breach of immigration bonds. Specifically, 8 C.F.R. § 103.6 mandates that immigration bonds be executed using a standard form, Form I-352.[8] Id. § 103.6(a). The regulation further provides that upon "[s]ubstantial performance of all conditions imposed by the terms of a bond," the obligor is released from liability. Id. § 103.6(c)(3). On the other hand, when "there has been a substantial violation of the stipulated conditions," the bond is breached. Id. § 103.6(e). Upon a violation of the stipulated conditions, the relevant district director must "determine whether the bond shall be declared breached" and "notify the obligor on Form I-323 or Form I-391 of the decision." Id. If declaring a breach, the notice must state "the reasons therefor." Id.

Because immigration bonds are contracts with the United States, determining whether a substantial violation has occurred is a matter of contract interpretation. Gonzales II, 2015 WL 2090395, at *5. Typically, contract interpretation presents a question of law for a court to decide de novo. See, e.g., SUFI Network Servs., Inc. v. United States, 785 F.3d 585, 589 (Fed. Cir. 2015); Kellogg Brown & Root Servs., Inc. v. United States, 109 Fed. Cl. 288, 299 n.8 (2013). However, because "application . . . of the concepts embodied [in the term substantial compliance] may require knowledge, immediately possessed by the agency, of an established custom or usage relating to the particular bond presented," courts take into consideration and grant deference to ICE's bond breach determinations. McLean v. Slattery, 839 F. Supp. 188, 1991 (E.D.N.Y. 1993) (quoting Stuyvesant Ins. Co. v. INS, 407 F. Supp. 1200, 1205 (N.D. Ill. 1975)) (alteration in original); accord Ruiz-Rivera v. Moyer, 70 F.3d 498, 501 (7th Cir. 1995); Int'l Fid. Ins. Co. v. Crosland, 490 F. Supp. 446, 448 (S.D.N.Y. 1980) ("It is for the agency . . . to formulate standards as to what violations should be deemed substantial.").

Courts thus have reviewed ICE's bond breach determinations using the Administrative Procedure Act's standards for evaluating agency action, under which the court will not disturb the agency's decision unless it was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); see also Gonzales II, 2015 WL 2090395 at *2 (citing Muratore v. U.S. Office of Pers. Mgmt., 222

---

[8] DHS inherited this regulation and many others from its predecessor agency, INS. See 68 Fed. Reg. 35273-01 (June 13, 2003) (explaining that "[t]he functions of the Immigration and Naturalization Service . . . and all authorities with respect to those functions[were] transferred to DHS on March 1, 2003" and that "references relating to the [INS] in statutes, regulations, directives or delegations of authority shall be deemed to refer to the appropriate official or component of DHS").

F.3d 918, 921–22 (11th Cir. 2000). This standard is "deferential," meaning the court will "sustain an agency action evincing rational reasoning and consideration of relevant factors." President & Fellows of Harvard Coll. v. Lee, 589 F. App'x 982, 986 (Fed. Cir. 2014). Put another way, in this context the court "must determine whether the [agency's] decision that the bond conditions were substantially violated was plainly erroneous or inconsistent with 8 C.F.R. § 103.6(e)." Ruiz-Rivera, 70 F.3d. at 501 (citing Thomas Jefferson Univ. v. Shalala, 512 U.S. 504, 512 (1994)).

### B.   Application of Standards

Mr. Aguilar does not deny that he violated the terms of the bond when he failed to deliver Mr. Gomez-Cazares to an ICE officer on February 28, 2008. As courts have recognized, however, § 103.6(e) "clearly provides that only upon a substantial violation may a bond be forfeited, not upon any violation." Bahramizadeh v. INS, 717 F.2d 1170, 1173 (7th Cir. 1983); accord Crosland, 490 F. Supp. at 448 ("The opinion of the Commissioner here reads the requirement of 'substantial' violation out of the regulation, for he considers any violation a warrant for forfeiture."). In determining whether a breach is a "substantial" violation, courts have looked to four factors: 1) the extent of the breach; 2) whether the breach was intentional or accidental; 3) whether the breach was in good faith; and 4) whether the obligor took steps to make amends or place himself in compliance. See Ruiz-Rivera, 70 F.3d at 501 (citing Bahramizadeh, 717 F.2d at 1173).

In this case, ICE applied these factors and concluded that Mr. Aguilar substantially violated the terms of the bond. It found that the breach committed was significant and intentional. Further, it rejected Mr. Aguilar's arguments that he acted in good faith and that he took reasonable steps to bring himself into compliance with the bond. The Court concludes that ICE's determination finding a substantial violation was neither arbitrary, nor capricious, nor contrary to law.

ICE concluded that the extent of the breach was substantial because Mr. Aguilar, in fact, never produced Mr. Gomez-Cazares to ICE. ICE Decision at 8; see also Def.'s Mot. at 13–14. In response, Mr. Aguilar acknowledges that he never delivered Mr. Gomez-Cazares to ICE, but contends that the extent of the breach was mitigated by the actions Mr. Gomez-Cazares took to address the underlying cause that led to the delivery demand—the immigration judge's removal order. See Pl.'s Mot. at 8–10; Pl.'s Reply at 3–4. According to Mr. Aguilar, he and Mr. Gomez-Cazares sought advice from an immigration lawyer within a few days of the February 28 delivery date, and Mr. Gomez-Cazares petitioned to have his removal proceedings re-opened on March 28. SAR at 73–74.

Mr. Aguilar's argument is, as ICE reasonably concluded, unpersuasive. First, any later steps Mr. Gomez-Cazares took to address the immigration judge's original decision finding him removable have no bearing on the extent to which Mr. Aguilar breached the bond's requirement that he produce Mr. Gomez-Cazares to ICE on February 28 in the first instance. Further, even if Mr. Gomez-Cazares's subsequent actions were somehow relevant in determining the extent of Mr. Aguilar's breach, a full month elapsed after the delivery date, and ten days elapsed after Mr. Aguilar's receipt of the Notice of Breach, before Mr. Gomez-Cazares petitioned for re-opening. This delay was a lengthy one by

any standard. See Ruiz-Rivera, 70 F.3d at 501 (holding that even though an immigrant who appeared one day late "may not have greatly breached the bond conditions," the extent of the breach still was "not trifling").[9]

Similarly, ICE's determination that the breach was intentional and not accidental was reasonable. As ICE found, Mr. Aguilar "chose to leave 101 W. Congress Parkway without ever making contact with ICE officials, as [he] knew [he was] required to do after having received the demand notice." ICE Decision at 8. Further, he "had not received any information from ICE that would suggest he need not deliver Mr. Gomez-Cazares, nor did [he] make any prior contact with ICE before the delivery date that would suggest delivery was not necessary." Id. ICE thus reasonably found that when Mr. Aguilar consciously decided not to deliver Mr. Gomez-Cazares to the agency on February 28, he intentionally violated the terms of the bond. See Ruiz-Rivera, 70 F.3d at 501 (breach intentional where immigrant chose not to report to ICE but to instead pursue an emergency motion to stay his deportation); cf. Ciniglio v. Thornburgh, No. CIV. A. 90-3939, 1991 WL 276081, at *3 (E.D. La. Dec. 17, 1991) (breach not intentional where neither the immigrant nor his attorney received notice of the immigrant's surrender date); Gomez-Granados, 608 F. Supp. at 1238 (no intentional breach where immigrant relied on his attorney's representation that he did not need to appear).

Notwithstanding the foregoing, Mr. Aguilar argues that ICE erred in finding a substantial violation of the bond based on his alleged "good faith." Mr. Aguilar argues that the delivery demand stated simply that the place of delivery was the building at 101 West Congress Parkway, and that, upon arriving there and showing the notice to a security guard, he was escorted to the basement. See SAR at 73 (declaration stating Mr. Aguilar's "sequence of events"); Pl.'s Mot. at 7–8; Pl.'s Reply at 3–4. According to Mr. Aguilar, they found no indication that Mr. Gomez-Cazares's case would be called, but were again told they were in the right place after they had waited fruitlessly for half an hour. See SAR at 73. Finally, they asked another court employee for assistance, who advised them that they should leave because Mr. Gomez-Cazares would be detained and possibly deported if they stayed. Id.[10]

---

[9] In a similar vein, Mr. Aguilar argues that the bond "was conditioned on both the alien appearing before [ICE] and the Immigration Judge," so that substantially violating the bond "would require that the alien not appear before either agency." Pl.'s Mot. at 9. This argument lacks merit. The terms of the bond required Mr. Aguilar to produce Mr. Gomez-Cazares "to an immigration officer or an immigration judge of the United States, as specified in the appearance notice." SAR at 35 (emphasis added). In this instance, the notice specified a demand that Mr. Aguilar deliver Mr. Gomez-Cazares to ICE, not to an immigration judge. Therefore, even if Mr. Aguilar had delivered Mr. Gomez-Cazares to an immigration judge on February 28, 2008 (and he did not), that would not have satisfied the terms of the bond.

[10] Mr. Aguilar appears to suggest that the breach that resulted when he left the building without delivering Mr. Gomez-Cazares to ICE on February 28, 2008 was somehow mitigated by the fact that the two fled because—based on advice allegedly given to them by an employee of the Immigration Court—they were fearful that Mr. Gomez-Cazares

In its decision, ICE noted that Mr. Aguilar's recitation of the events that transpired has changed over time and lacked "indicia of reliability" because his written account was not sworn to under penalty of perjury. But even assuming that Mr. Aguilar's assertions were accurate, ICE found, Mr. Aguilar's failure to deliver Mr. Gomez-Cazares was not in good faith because he did not make a "reasonable effort" to deliver Mr. Gomez-Cazares after arriving at 101 West Congress Parkway. ICE Decision at 8–11. In particular, ICE reasoned that Mr. Aguilar failed to read the demand notice carefully, because if had he done so he would have understood that his obligation was to deliver Mr. Gomez-Cazares to ICE (the agency that issued the demand), not EOIR. Id. at 10. ICE also observed that it "would reasonably expect an obligor who had completed bond paperwork less than four months prior to remember the general location of the ICE Offices and to be able to follow the signage to return there." Id. at 11; see also Def.'s Mot. at 14 ("Mr. Aguilar failed to take reasonable steps to locate the appropriate ICE officials who could take custody of the bonded alien."); id at 15 ("[A] reasonable person in Mr. Aguilar's shoes would have read the ICE delivery demand and followed obvious building signs to the ICE office where he executed the bond just a few months earlier.").

These conclusions are not, in the Court's view, plainly erroneous. In light of the fact that Mr. Aguilar secured Mr. Gomez-Cazares's release from custody based on a promise to deliver him on demand, it was reasonable to expect him to take every precaution to ensure that he understood and complied with the notice directing him to deliver Mr. Gomez-Cazares to ICE on February 28.

Further, and perhaps most persuasive to the Court, is ICE's clearly correct conclusion that Mr. Aguilar failed to take any steps after the breach to come into compliance with the bond. See ICE Decision at 8.[11] Even had ICE concluded that Mr. Aguilar acted in good faith on February 28, 2008, Mr. Aguilar's lack of action after that

---

might be deported if he remained. The Court is not unsympathetic to Mr. Aguilar's concerns for the welfare of his family member, particularly given the fact that Mr. Gomez-Cazares had never received notice of the hearing that resulted in the in absentia removal order. But the problem for Mr. Aguilar is that in executing the bond, he made an absolute promise to deliver Mr. Gomez-Cazares to ICE upon demand, even if doing so might ultimately result in Mr. Gomez-Cazares's deportation or some other similarly unwanted consequence. In exchange for this absolute promise, ICE agreed to release Mr. Gomez-Cazares from custody pending the completion of administrative proceedings. The Court therefore does not view Mr. Aguilar's explanation of the reason for his failure to deliver Mr. Gomez-Cazares to ICE as relevant to his claim that he did not substantially violate the terms of the bond.

[11] It is worth noting that ICE has a mitigation policy in place allowing an obligor to recover a portion of the bond if the alien is delivered within 90 days of the breach. See ICE Decision at 8 n.11. Thus, Mr. Aguilar could have recovered some of his bond had he produced Mr. Gomez-Cazares at a later date.

day (and after he then received notice of the breach) would be sufficient in and of itself to support ICE's conclusion that he substantially violated the bond.[12]

## CONCLUSION

ICE's conclusion that Mr. Aguilar substantially violated the conditions of the bond was reasonable and consistent with law. Accordingly, plaintiff's motion for judgment on the administrative record is **DENIED** and Defendant's cross-motion for judgment on the administrative record is **GRANTED**. The clerk is directed to enter judgment accordingly. The parties shall bear their own costs.

**IT IS SO ORDERED.**

  /s/ Elaine D. Kaplan
ELAINE D. KAPLAN
Judge

---

[12] The Court is not persuaded by Mr. Aguilar's argument that the actions that Mr. Gomez-Cazares took to successfully re-open his immigration proceedings and eventually obtain legal permanent residence should be considered in determining whether Mr. Aguilar took steps to make amends or bring himself into compliance. See Pl.'s Mot. at 9; Pl.'s Reply at 4.  As explained above, Mr. Gomez-Cazares's actions and his eventual success before EOIR did not mitigate Mr. Aguilar's failure to deliver him to ICE upon ICE's demand.